**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SECURE LEVERAGE GROUP, INC., | ) | |
| TREASURE ISLAND COINS, INC., DAVID | ) | |
| G. BEYERLEING, RICHARD W. MEDLEY, | ) | |
| MICHAEL KRALL, JAMES LANDRUM, JR., | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 14 CV 05024 |
| | ) | |
| IRA BODENSTEIN, | ) | |
| Defendant-Appellee; | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. COMMODITY FUTURES TRADING | ) | |
| COMMISSION, | ) | |
| Intervenor. | ) | |
| ─────────────────────────────── | ) | |
| | ) | |
| ROBERT MILLER, FARGO 500 LLC, | ) | |
| GAINESVILLE COINS, INC., | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 15 CV 04260 |
| | ) | |
| IRA BODENSTEIN, | ) | |
| Defendant-Appellee. | ) | |
| ─────────────────────────────── | ) | |
| | ) | |
| ROBERT MILLER, FARGO 500 LLC, | ) | |
| GAINESVILLE COINS, INC., | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 15 CV 00344 |
| | ) | |
| IRA BODENSTEIN, | ) | |
| Defendant-Appellee. | ) | |
| | ) | Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are the bankruptcy appeals brought by two groups of former customers of the now defunct Peregrine Financial Group ("Peregrine") against its trustee, and appellee here, Ira Bodenstein. The first appeal, 14 C 05024, raises two primary issues. First, the appellants in that case challenge the bankruptcy court's ruling that their retail foreign exchange ("forex") and OTC metal contracts were not commodity contracts within the meaning of 11 U.S.C. § 761(4), and therefore did not receive Chapter 7 protection as "customer funds."[1] *In re Peregrine Fin. Group, Inc*., 510 B.R. 190, 205 (Bankr. N.D. Ill. 2014). Second, they appeal the bankruptcy court's finding, after the conclusion of a bench trial, that their funds were not held in a resulting trust by Peregrine and, thus, were properly included in the bankruptcy estate. *See In re Peregrine Fin. Group, Inc*., 12 B 27488, 2014 WL 2197945, at *23 (Bankr. N.D. Ill. May 27, 2014).

After the bankruptcy court entered its judgment, a second group of customers, represented by the same attorney, filed a class action complaint ("the FOREX Class Action") against Bodenstein, which the bankruptcy court dismissed as untimely. *See In re Peregrine Fin. Group, Inc*., No. 12 B 27488, 2015 WL 2237201, at *3 (Bankr. N.D. Ill. May 13, 2015). That dismissal forms the basis of the second appeal, 15 C 04260, in which the customers argue that the court should have construed their class action claims as amended proofs of claim that relate back, under Rule 15(c), to their timely filed initial proofs of claim.

Not content merely to defend on appeal these victories in the bankruptcy court, Bodenstein has, for his part, moved for sanctions against the customers and their counsel. That

---

[1] The Commodities Futures Exchange Commission has intervened as a party with respect to this issue only. *See* 11 U.S.C. § 762(b) (entitling the CFTC to appear and be heard in any commodity broker liquidation case covered by 11 U.S.C. §§ 761-767).

motion is pending in case 15 C 344, which was opened when the customers moved to withdraw the reference in the Forex Class Action. For the reasons that follow, the bankruptcy court's judgments are affirmed and Bodenstein's motion for sanctions is denied.

## BACKROUND

Peregrine was a registered "Future Commission Merchant" ("FCM") and a registered "Forex Dealer Member" of the National Futures Association. FCMs are similar to stock brokerages but instead of dealing in stocks they deal primarily in financial instruments known as futures contracts.[2] FCMs also may deal in instruments other than futures. Peregrine, in addition to futures, dealt in retail foreign currency transactions ("retail forex") and spot metal transactions.[3] These instruments are often referred to as "over the counter" transactions because, among other things, unlike futures they are not traded on an exchange or cleared by a clearing organization.

The appellants are investors who executed a number of retail forex and spot metals contracts with Peregrine.[4] In executing these contracts, Peregrine required all of the appellants to

---

[2] A futures contract is an agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at initiation of the contract; (2) that obligates each party to the contract to fulfill the contract at a specified price; (3) that is used to assume or shift price risk; and (4) that may be satisfied by delivery of an offset. *See Commodity Futures Trading Commn. v. Zelener*, 373 F.3d 861, 864 (7th Cir. 2004). Futures, like most stocks, are traded on highly regulated exchanges. *Id.*

[3] Retail forex contracts are agreements between FCMs and customers for the purchase or sale of a national currency using the currency of another country. *See id.* at 863. Spot metal contracts are contracts for the present purchase or sale of precious metals at a price specified in the contract, for immediate or deferred delivery. *See In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 966 (N.D. Ill. 2014) ("Spot contracts contemplate a contract for the exchange of title and delivery of the product within a short period and are not intended to facilitate speculation regarding the future price of the commodity.").

[4] The appellants in both appeals were customers of Peregrine and are represented by Michael C. Moody and Michael J. O'Rourke from O'Rourke & Moody. The appellants in Case 14 C 5024 are Secure Leverage Inc., Treasure Island Coins Inc., David G. Beyerlein, Richard W Medley, Michael Krall, and James Landrum Jr. These customers traded in both forex and spot

sign a Customer Agreement (or "Agreement") before they could open a trading account. Brief of Appellee 4, 14-CV-05024, ECF No. 13. The Agreement required customers to wire the funds they wished to trade to an account at JPMorgan Chase Bank in the name of "PFG, Inc.," before Peregrine would execute the trade for them. *Id.* Per the Agreement, Peregrine was not required to hold the appellants' forex and spot metals funds separate from its operating funds. Indeed, when the forex bank accounts' assets exceeded Peregrine's obligations to its retail forex customers, Peregrine would use the excess balance to pay off its own liabilities. *Id.* This stands in contrast to Peregrine's customers' futures funds, which by law were required to be held in separate accounts. The Agreement also contained a risk disclosure, which informed the plaintiffs that their forex deposits lacked the regulatory protections given to futures funds and warned that if Peregrine filed for bankruptcy, the plaintiffs might be treated as unsecured creditors. *Id.*

In 2012, it was discovered that over a twenty-year period Peregrine's CEO, Russel L. Wasendorf, had embezzled nearly $200 million from Peregrine's segregated customer future accounts. Brief of Appellants 2, 14-CV-05024, ECF No. 8. In July 2012, as a result of this defalcation, Peregrine filed for bankruptcy. Ira Bodenstein was appointed as Peregrine's trustee. In September 2012, Bodenstein filed a motion seeking authority under section 766(h) of the Bankruptcy Code to make interim distributions of "customer property" to Peregrine customers who had traded in "commodity contracts," as that term is defined in section 761(4) of the

---

metal Peregrine accounts. Robert Miller, Fargo 500 LLC, and Gainesville Coins, Inc. were the named plaintiff customers in the FOREX Class Action, 15 C 00344. Miller held two accounts with Peregrine: one of these accounts was in his own name, while the other account was in the name of Fargo LLC, which Miller owned and controlled. Both of Miller's accounts were used to trade in only forex transactions. The other corporate plaintiff in the FOREX Class Action, Gainesville LLC, is a Florida company that traded through Peregrine only in spot metal transactions. For ease of reference, all the plaintiffs are collectively referred to as Peregrine "customers" throughout this opinion. Any relevant distinction between the plaintiffs is noted when appropriate.

Bankruptcy Code. *See In re Peregrine Fin. Group, Inc*., 510 B.R. at 192. Bodenstein excluded Peregrine's retail forex and OTC metal customers from the partial distribution, however, on the ground that forex and OTC metal accounts did not qualify as "commodity contracts." *Id.*

The customers objected and filed an adversary complaint against Bodenstein arguing that their forex and OTC metal transactions with Peregrine qualified as commodity contracts under section 761 and that the funds in those accounts should have been included in the interim distribution. *Id.* They argued that although their transactions were not futures contracts—which are expressly included within the definition of commodity contracts—they were close enough to futures contracts to fall within section 761(4)(F)(i), which includes as commodity contracts transactions that are "similar to" the other types of transactions specifically defined section 761(4). 11 U.S.C. § 761(4)(F)(i). In the alternative, the customers also argued that their funds had been held in a resulting trust by Peregrine and, thus, should be distributed apart from the bankruptcy estate. Because title to their funds was never transferred to Peregrine, the customers argued, they should have their funds paid in full immediately.

On summary judgment, the court rejected the customers' contention that their forex and OTC metal transactions shared enough features with futures contracts to fall within the "similar to" provision of Section 761 and therefore dismissed the related counts of the customers' complaint. *In re Peregrine Fin. Group, Inc*., 510 B.R. at 205. After a bench trial on the remaining counts,[5] the court went on to find that the customers had failed to meet their burden of proof with respect to their argument that the funds had been held in a resulting trust and concluded that once the customers transferred their funds to Peregrine they no longer retained title to those funds. *See In re Peregrine Fin. Group, Inc*., WL 2197945 at *23.

---

[5] Count III, seeking a constructive trust, was dismissed by agreement on the eve of trial. WL 2197945 at *2.

After the first adversary proceeding was terminated, the second group of customers filed the FOREX Class Action adversary proceeding against Bodenstein, alleging breach of fiduciary duty, fraud, unjust enrichment, and conversion; they also sought the imposition of a constructive trust. After filing their class action complaint, the customers filed a motion to withdraw the proceeding from the bankruptcy court to the district court, arguing that they had a right to a jury trial on their claims and that their claims against the trustee were non-core under 28 U.S.C. § 157(b). That motion was mooted, however, on May 13, 2015, when the Bankruptcy Court dismissed the class action complaint as untimely. *See In re Peregrine Fin. Group, Inc.*, 2015 WL 2237201, at *3. Bodenstein's motion for sanctions in that case, however, survives the dismissal of the motion to withdraw the reference and is addressed herein.

## DISCUSSION

District courts have jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges entered in Chapter VII bankruptcy proceedings. 28 U.S.C. § 158(a). Because "[d]istrict courts sit as appellate courts when hearing appeals from bankruptcy courts," *Hijjawi v. Five North Wabash Condo. Ass'n*, 491 B.R. 876, 880 (N.D. Ill. 2013) (citing *In re Neis*, 723 F.2d 584, 588 (7th Cir. 1983)), the district court applies a dual standard of review that "examine[s] the bankruptcy court's determinations of law de novo and its findings of facts for clear error." *In re Smith*, 582 F.3d 767, 777 (7th Cir. 2009).

In their consolidated appeals, appellants present the following issues for review:

> a. Did the bankruptcy court err in finding that Peregrine's forex and spot metal customers were not placed in a resulting trust?

> b. Did the bankruptcy court err in finding that 11 U.S.C. § 761(4)(F)(i) (the "similar contracts clause") does not extend to forex and metals contracts because such contracts are not "similar to" futures contracts?

c. Did the bankruptcy court err in dismissing the customers' class action complaint as untimely because they brought it after the bar date for filing a proof of claim?

d. Did the Bankruptcy Court err in refusing to consider the class action complaint as an amendment of customers' proofs of claim which related back to the date those claims were filed?

These issues are addressed in turn below.

## A. Resulting Trust

The customers contend that the funds they placed in their forex and spot metals accounts were held by Peregrine in a resulting trust and thus should not be distributed as part of the bankruptcy estate distributions. Brief for Appellants 4-10, 14-CV-05024, ECF No. 8. Because their funds were not part of the bankruptcy estate, the customers argue, they should be paid in full immediately. After a bench trial, the bankruptcy court, in an exhaustive 46-page written opinion, provided a clear and convincing explanation for its holding that the customers' funds were not held by Peregrine in trust. In sum, the bankruptcy court concluded that the customers had failed to establish by clear and convincing evidence that in transferring funds to Peregrine they intended to create a trust. To the contrary, the bankruptcy court found that the customers knew and understood that in funding their forex and metals accounts at Peregrine, they were surrendering legal and equitable ownership of those funds to Peregrine, that the funds could be comingled with other Peregrine accounts and funds, that Peregrine could use the funds for its own purposes, and that in the event of Peregrine's insolvency, the customers would not have a secured or priority claim on the funds credited to their Peregrine accounts.

Both parties agree that Illinois state law controls the question as to whether the customer Agreement between Peregrine and the customers formed a resulting trust. Generally, a resulting trust arises when one person purchases property in the name of a third party that has no actual

interest in that property. *In re Estate of Koch*, 697 N.E.2d 931, 933 (Ill. App. Ct. 1998). Because resulting trusts seek to further the intent of the parties who entered the transaction, they are characterized as "intent enforcing" devices that are created by operation of law with their "roots in the presumed intention of the parties." *In re Wilson's Est.*, 410 N.E.2d 23, 26 (Ill. 1980). Thus, in assessing whether the Agreement created a resulting trust, the Court's inquiry turns on the intent of the parties when they consummated the transaction. *Id.* Under Illinois law, the burden is on the plaintiff to show by clear and convincing evidence that the parties intended to create a resulting trust. In this vein, a presumption of a resulting trust will not be found if "the transaction can be construed in any other reasonable fashion." *Gary-Wheaton Bank v. Myer*, 473 N.E.2d 548, 552 (Ill. App. Ct. 1984). Once a party has met this burden, there is a rebuttable presumption that a resulting trust was created. *Id.* Here, however, it is apparent that the customers have failed to raise any such presumption.

The customers' principal argument is that they have provided sufficient evidence to warrant the presumption that a resulting trust existed because they offered evidence indicating that they paid consideration for the right to trade on their accounts. Under Illinois law, a presumption of "[a] resulting trust arises wherever the circumstances surrounding the disposition of property raise an inference . . . that the transferor does not intend that the person taking or holding the property . . . should have the beneficial interest therein." *Hong Kong Electro-Chemical Works*, *Ltd. v. Less*, 539 F.3d 795, 798 (7th Cir. 2008) (internal quotation and citation omitted). As the customers note, Illinois courts have found that a resulting trust was created when one person furnishes consideration for the purchase of property and conveys title to that property to another. *See, e.g., Meyer*, 473 N.E.2d at 551. This is often referred to as a "purchase money trust." *Am. Nat. Bank and Trust Co. of Rockford, Ill. v. United States*, 832 F.2d 1032,

1035 (7th Cir. 1987). In the typical purchase money trust scenario, "one person supplies the money to buy something but title is placed in another person's name." *Id.* Because title to the property was taken in the name of a third party, the payment of consideration serves an evidentiary function, supporting a claim that although the payer purchased the property in the name of another, he actually intended to retain equitable title to that property. *Id.* at 1036.

As the bankruptcy court observed, however, "the situation in this case bears no resemblance to the purchase money resulting trust cases cited by the plaintiffs." *In re Peregrine Fin. Group, Inc*., 2014 WL 2197945, at *3. In support of their argument, appellants cite *In re Estate of Wilson* and *In re Estate of Koch*, both of which involved a purchase money trust. In *Wilson*, a husband used his own funds to purchase several hundred shares of securities in his wife's name. 410 N.E.2d at 26. Wilson, the husband, put the securities in his wife's name to make it easier for her to receive the shares if he died, but he did not intend for her to have a present interest in the shares while he was living. Things did not go according to plan, however, as his wife died before he did. In finding that the shares were held in a resulting trust in favor of Wilson, and that his wife never had a present possessory interest in the stocks, the court noted that Wilson had retained the management, use, and control of those stocks. Aside from being the strawman owner of the stocks, his wife had no role in overseeing the management of the shares. Thus, the payment of consideration was just one of many factors the court looked to in determining that Wilson retained equitable title to the property. Similarly, in *In re Estate of Koch* the court found that a resulting trust existed in favor of Koch when he purchased a vacation home in his wife's name but had furnished all the consideration for that property, selected its location, and consummated the real estate transaction. 697 N.E.2d at 933.

The purchase money transactions in *Koch* and *Wilson*, where the owner of title never actually physically possessed the property, stand in contrast with cases where property— including money—was physically transferred to a third party. In this situation, under Illinois law, there is presumption that the possessor owns the property. *See, e.g.*, *In re Stand. Foundry Products, Inc*., 208 B.R. 164, 167 (Bankr. N.D. Ill. 1997). This is because the evidentiary function that consideration serves in determining who held equitable title to the property is overborne by the third party's actual possession of the property. For example, when a customer deposits money into a bank, under Illinois law, the customer has transferred ownership of those funds to the bank. *Durkee v. Franklin Savings Assoc*., 309 N.E. 2d 118, 120 (Ill. App. Ct. 1974) ("[T]he moment the money is deposited it actually becomes the property of the bank. The bank and the depositor thereby assume the legal relation of debtor and creditor."). Although the customer may intend to retain access to those funds, they have in fact relinquished title to the bank, which then owes a contractual obligation to pay out those funds when the customer wishes to make a withdrawal. *United States v. Davis*, 989 F.2d 244, 246 (7th Cir. 1993) (noting that once a check is deposited, the bank becomes the owner of the money and the depositors are mere creditors to the bank rather than owners of the funds); *Menicocci v. Archer National Bank of Chicago*, 385 N.E.2d 63, 66 (Ill. App. Ct. 1978) (indicating that "[a] debtor/creditor relationship exists between the depositor and the bank" once funds are deposited). Thus, even though the depositor has in some sense furnished consideration to the bank with the deposit, no presumption of a trust arises because, unlike the purchase money situation, the bank has physical control over the funds and has authority to deal in them as it sees fit. Instead, the bank simply owes the depositor a contractual obligation to pay out those funds upon the depositor's request.

As the bankruptcy court aptly noted, notwithstanding the customers' payment of consideration, their forex and metals accounts had none of the features of the purchase money trust scenarios present in *Wilson* and *Koch*. Instead, the customers' relationship with Peregrine was more akin to a debtor/creditor relationship that a depositor forms with a bank. Unlike the transactions in *Wilson*, or any other purchase money transaction, the customers did not furnish consideration to purchase property in the name of someone else with the intent that they would retain ownership of that property. Indeed, as the bankruptcy court's opinion details, at trial the customers were unable to articulate what they purchased with the funds they deposited in their accounts. The trading accounts were opened before any funds were deposited and so far as the evidence shows, there was no required minimum to keep an account open; the deposit of funds into the account was, as the bankruptcy court explained, "a contractual precondition to placing trades," 2014 WL 2197945, at *23, not consideration for opening the accounts. The customers themselves disavowed the notion that the funds on deposit were consideration for foreign currencies purchased by testifying that they believed Peregrine could use the funds in their accounts only to pay commissions and to cover trading losses, and in any event they presented no evidence of how the deposited funds were used, what the margin requirements were, or how Peregrine conducted forex trades, so there was no evidentiary basis to conclude that the customers' funds, in whole or part, had in fact been used to purchase foreign currencies generally, much less what specific transactions had occurred. There was, in short, no basis to conclude what, if anything, the funds deposited by the customers had purchased. Instead, much like a depositor at a bank, appellants placed their funds in their Peregrine accounts with the expectation that they would be able to trade in retail forex and OTC metals when they requested

to do so; the bankruptcy court therefore reasonably concluded that the customers' claims to those funds sounded in contract and not in equity.[6]

When asked what the foundation was for their belief that they retained an equitable ownership of their funds, the appellants pointed—as they do here—to paragraph eight of the Peregrine Customer Agreement. But that provision in fact belies their assertion that they retained ownership of the deposited funds. Paragraph eight of the Agreement, which pertains to collateral, states in part:

> All funds, securities, commodities, commodity futures contracts, commodity option contracts, and other property of Customer which PFGBEST or its affiliates may at any time be carrying for Customer . . . are to be held by PFGBEST as security and subject to a general lien and right of setoff against liabilities of Customer to PFGBEST . . .At any time, PFGBEST may in its discretion, with or without notice to Customer, apply and/or transfer any or all funds or other property of Customer between any of Customer's Accounts. Additionally, Customer hereby grants to PFGBEST the right to pledge, repledge, hypothecate, sell or purchase, invest or loan . . . property of Customer held by PFGBEST as margin or security. The value of any such collateral shall be determined by PFGBEST in its sole discretion and based upon what PFGBEST would receive if PFGBEST sold the relevant collateral for immediate delivery. PFGBEST shall at no time be required to

---

[6] Appellants repeatedly conflate issues of contractual and equitable rights. For example, they ask why, if Peregrine was the beneficial owner of the funds they deposited, would the Agreement provide for the payment of commissions to Peregrine. But the fact that the customers retained some contractual rights to the funds on deposit does not mean that they retained equitable or legal ownership of the funds, any more than does the fact that a bank deposit agreement spelling out the bank's right to deduct certain service fees from an account alters the fact that, under Illinois law and as the appellants concede (Mem. in Support, ECF 8 at 10), the bank is the legal and equitable owner of the funds on deposit. The appellants attempt to avoid the implications of this analogy for their resulting trust argument by noting that a bank customer has a contractual relationship directly with the bank, while they have no similar relationship with Chase, where Peregrine maintained its account. That distinction falls flat; in the analogy between a bank customer and a bank to which it has transferred its funds, Peregrine plays the role of the bank, and it is undisputed that there are contractual agreements directly between the appellants and Peregrine. Peregrine's relationship with Chase, or the appellants' lack thereof, is irrelevant to the question of whether they intended a resulting trust when they deposited funds with *Peregrine*.

> deliver to Customer the identical property delivered to or
> purchased by PFGBEST for any account of Customer.

Appellants' Ex. 1: Customer Agreement, ¶ 8, 14-CV-05024, ECF No. 9. This provision of the

Agreement, which applies to both futures and non-futures accounts, gives Peregrine complete

control over collateral funds deposited into customer accounts. Just as banks may loan and

borrow against customer deposits at their discretion, paragraph 8 gave Peregrine absolute

discretion to dispose of collateral funds and to determine the value of those funds. Nothing in

that provision—or any other provision in the Agreement—provides the context that would

support the purchase money trust type scenario in *Wilson*.

Appellants contend that because paragraph 8 of the Agreement "is replete with references

to Customers' ownership of their property," it follows that "accounts defined as customer

property were property of customers." Brief of Appellant 8, 14-CV-05024, ECF No. 8.[7] But that

of course begs the question. Undoubtedly some of the instruments that Peregrine dealt in

remained "customer property." But that does not mean that all the instruments Peregrine dealt in

remained customer property after the transfer of funds to their accounts with Peregrine. The

Agreement, which was used with respect to all Peregrine accounts, does not define when funds

in a customer account constitute customer property and when they do not.

---

[7] Appellants represent that the bankruptcy court, in ruling on a motion to dismiss
Bodenstein filed, held "that the language of [p]aragraph 8 of the Customer Agreement supported
Customers' claim that they retained equitable ownership of their accounts." ECF No. 8 at 7. But
at trial, appellants made this same representation and the bankruptcy court promptly rejected it,
stating: "In their written opening statement, plaintiffs referred to paragraph 8, stating that the
court 'ruled affirmatively' in its opinion denying the trustee's motion to dismiss that the
Agreement 'recognized and stipulated that customer funds remained property of the customer
while being held in Peregrine customer accounts. That is not correct. In rejecting an argument
made by the trustee for dismissing the case based on one sentence in paragraph 8, the court stated
that paragraph 8 contained language that was in conflict with the trustee's contention and that
supported the plaintiff's argument against dismissal. The court never concluded that paragraph 8
gave the plaintiffs any particular rights." *In re Peregrine Fin. Group, Inc.*, 12 B 27488, 2014 WL
2197945, at *14 (Bankr. N.D. Ill. May 27, 2014).

*That* question is answered not by the Agreement, but by reference to the statutory and regulatory context that governed the types of financial instruments Peregrine traded. The Agreement states that the parties "shall be bound by all applicable laws, rules, and regulations, including the commodity exchange act," and these laws shed light on what can reasonably be considered customer property under the Agreement. Peregrine Appellants' Ex. 1: Customer Agreement, ¶ 2, 14-CV-05024, ECF No. 9. The Commodities Exchange Act requires that futures accounts are segregated, which strongly indicates that equitable title to those futures is never transferred to the broker. *See In re Dreier LLP*, 544 B.R. 760, 769 (Bankr. S.D.N.Y. 2016). Because title is never transferred, those futures contracts remain "customer property." Appellants' retail forex accounts, by contrast, are not required to be held in segregated accounts and could be commingled with other funds and used to pay Peregrine's liabilities. Having surrendered complete control over the funds to Peregrine, there is no similar basis to conclude that the funds deposited by forex and metals customers remained "customer property" under the terms of the Agreement. And put more precisely, the bankruptcy court did not err in concluding that in light of that surrender, the appellants failed to produce clear and convincing evidence that in transferring funds to Peregrine they intended to create a trust.

Appellants' contention at trial that they believed they retained complete ownership of their funds, moreover, is further belied by the Forex Risk Disclosure statement each of the appellants signed. That disclosure statement indicated that their accounts were not,

> subject to the customer funds protections provided to customers trading on a contract market that is designated by the Commodity Futures Trading Commission. ***Your dealer may commingle your funds with its own operating funds or use them for other purposes. In the event your dealer becomes bankrupt, any funds the dealer is holding for you in addition to any amounts owed to you resulting from trading, whether or not any assets are***

*maintained in separate deposit accounts by the dealer, may be treated as an unsecured creditor's claim.*

Appellants' Ex. 1: Risk Disclosure Statement, ¶ 3, 14-CV-05024, ECF No. 9 (emphasis added). The disclosure plainly states that Peregrine may use the customers' funds for any purpose, which stands in contrast to the purchase money situation were the payor retains complete control over the subject property. At trial, the customers indicated that they understood the disclosure when they signed it and were aware their accounts would lack the protection available for non-futures accounts. Thus, it was entirely reasonable for the trial court to find the customers' self-serving testimony incredible, as with one breath they were arguing that they believed they still owned the funds and with the next conceding that they understood that they could be treated as unsecured creditors in the event of a bankruptcy. The appellants' effort to dismiss the risk disclosure as just a "general warning" of what might happen is unconvincing, to say the least; the fact that the customers knew and agreed that they could be treated as unsecured creditors means that they knew and agreed that the funds they deposited were not being held for them in trust.

In assessing whether the bankruptcy court's finding that the appellants did not intend to establish a resulting trust when they deposited their funds with Peregrine, it also bears noting that the court found that the testimony of the appellants lacked credibility not only on the basis of the information that was available to them, but also based on their demeanor and inability to support the conclusory and "formulaic" testimony they provided about their lack of intent. Each witness offered "virtually identical," conclusory, unsupported, and unconvincing testimony in support of their claims: each stated they never intended to pass title of their funds to Peregrine, and each believed they still owned the funds. 2014 WL 2197945, at *23. None of the witnesses offered any credible explanation for this belief, which was belied by the evidence of how their accounts were actually managed. Michael Krall, for example, testified that he believed that the funds he

transferred to Peregrine for forex trading would be held "in a separate account in his name at Chase." *Id*. Yet the funds he transferred at Chase were transferred into a Peregrine forex account, not an account in his name. Moreover, Krall read and signed the Forex Risk Disclosure statement on no less than three occasions, which plainly stated that Peregrine could comingle his funds with its own funds. The bankruptcy court noted that the other plaintiffs' testimony provided similar shortcomings. *See id.* The bankruptcy judge did not abuse her discretion in determining that this self-serving, unsupported testimony was not credible.

Accordingly, the bankruptcy court's finding that the appellants did not transfer funds to Peregrine intending to create a resulting trust was well-supported and not clearly erroneous. And because the appellants failed to establish their intent to create a resulting trust by clear and convincing evidence, the bankruptcy court properly held that they were entitled to no presumption in that regard.

### B. "Similar to" Clause

The next issue the customers present is whether the bankruptcy court erred in granting summary judgment in favor of Bodenstein on Count IV of appellants' complaint because it found that their retail forex and OTC metals contracts were not commodity contracts within the meaning of 11 U.S.C. § 761(4) and were thus ineligible for the highest priority of repayment in a commodity broker liquidation. More precisely, while they acknowledge that forex and metals contracts are not commodities contracts, they assert that such contracts are sufficiently "similar to" futures contracts to receive priority under Section 761. *See* § 761(4)(F)(i) (defining "commodity contract" to include "any other contract . . . that is similar to" other contracts constituting commodity contracts).

When a commodity broker, such as Peregrine, becomes insolvent, the resulting bankruptcy proceedings are governed by subchapter IV of Chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. §§ 761-767. Chapter 7 gives customers of an insolvent commodity broker priority in the distribution of "customer property." 11 U.S.C. § 766(h). The trustee of a bankruptcy estate is required to "distribute customer property ratably to customers on the basis and to the extent of such customers allowed new equity claims, and in priority to all other claims." *Id*. Thus, the priority that customers receive depends in significant part on the breadth of the term "customer property."

Customer property is defined as "property received, acquired, or held to margin, guarantee, secure, purchase, or sell a ***commodity contract***." 11 U.S.C. § 761(10)(A)(i) (emphasis added). Chapter 7 then provides the following definition of a commodity contract:

> (4) "commodity contract" means—
>
> (A)     with respect to a futures commission merchant, contract for the purchase or sale of a commodity for future delivery on, or subject to the rules of, a contract market or board of trade;
>
> (B)     with respect to a foreign futures commission merchant, foreign future;
>
> (C)     with respect to a leverage transaction merchant, leverage transaction;
>
> (D)     with respect to a clearing organization, contract for the purchase or sale of a commodity for future delivery on, or subject to the rules of, a contract market board of trade that is cleared by such a clearing organization, or commodity option traded on, or subject to the rules of, a contract market or board of trade that is cleared by such clearing organization;
>
> (E)     with respect to a commodity options dealer, commodity option;

(F)　　(i) any other contract, option, agreement, or transaction that is similar to a contract, option, agreement, or transaction referred to in this paragraph; and

(ii) with respect to a futures commission merchant or a clearing organization, any other contract, option, agreement, or transaction, in each case, that is cleared by a clearing organization.

11 U.S.C. § 761(4). The customers, pointing both to the language of the statute and to congressional intent, maintain that their retail forex contracts are "commodity contracts" under section 761(4)(F)(i) because they are "similar to" futures contracts. Thus, the funds associated with those accounts are "customer property" that should be immediately distributed to them. Bodenstein, along with intervenor CFTC, dispute the point, maintaining that the customers' transactions are "spot contracts" that fall outside the scope of the Commodity Exchange Act and the associated Chapter 7 protections.[8]

Largely on the strength of the Seventh Circuit's opinion in *In re Zelener*, 373 F.3d 861 (7th Cir. 2004), the bankruptcy court sided with Bodenstein and the CFTC. In *Zelener,* the Seventh Circuit considered whether "[forex transactions] are contracts of sale of a commodity for future delivery regulated by the Commodity Futures Trading Commission." *Id.* at 862. The defendant was a commodities broker that, like Peregrine, also dealt in retail foreign currency. The defendant required its forex customers to sign a customer agreement that provided that the defendant was the counterparty to any forex transactions the customers executed. Those transactions would begin with a customer placing an order to buy or sell a particular currency in a quantity chosen by the customer. Although the contract would require the transaction to be

---

[8] In its summary judgment opinion, 510 B.R. 190, 196, the bankruptcy court observed that the plaintiffs admitted in depositions that their forex transactions were spot transactions at an "immediate" price, not a future price, that they were transactions in the actual currency, not in a contract, and that the forex market was "the spot market, the cash market." As appellants, they have not disputed the bankruptcy court's characterization of their testimony.

settled within 48 hours, the parties would rarely do so. Instead, the defendant would roll the contracts forward two days at a time. These rollovers allowed the customer to keep an open position in the currency. If the currency appreciated while the customer maintained this open position, he could realize the currency's gains by immediately taking delivery of the currency or selling an equal amount of currency back to the defendant, thereby closing his position.

The plaintiff argued that these forex agreements were in fact futures contracts because the positions could be held open indefinitely, which meant that, like futures contracts, the customers' gains or losses depended on future price movements. The *Zelener* court disagreed and distinguished retail forex transactions from futures contracts because the "customer buys foreign currency immediately rather than as of a defined future date and because the deals lack standard terms. [The defendant] buys and sells as a principal; transactions differ in size, price, and settlement date. The contracts are not fungible and thus could not be traded on an exchange." *Id.* at 864. The court added that "contracts of sale of a commodity for future delivery" could not refer to all contracts in which settlement occurs in the future, as the Act would encompass nearly all executory contracts. *Id.* at 865.

Here, the bankruptcy court concluded, and this Court agrees, that the reasoning in *Zelener* "compels the conclusion that retail forex transactions are not 'similar to' futures" because *Zelener* illustrated these two types of transactions were not alike in "substance or essentials." The customers urge that Zelener is not controlling because it only considered whether forex transactions **were** futures contracts and not whether forex transactions were **similar** to futures contracts, that distinction is of no moment because the Zelener court compared and elucidated the salient features of the two instruments. Futures contracts are fungible instruments that allow parties to trade in the contract with a clearinghouse accepting the risk of any counterparty

default. Retail forex, in contrast, involves private transactions that bear no fungible features. Each forex transaction pairs a unique currency in varying quantities and with varying settlement dates. And unlike futures, or any other transaction that is defined as a "commodity contract" in section 761(4), appellants' OTC transactions were not required to be held in segregated accounts. Nor were the transactions conducted on a formal exchange or insulated by a clearing house. In short, appellants engaged in spot transactions that did not fall within the purview of section 761.[9]

The customers argue that, even if *Zelener* is controlling, their accounts fall within an exception identified in *Zelener*. The *Zelener* court indicated that an off-exchange transaction could be a futures contract if the seller unconditionally promised to provide an offsetting transaction in the event the customer wanted to close his position on demand. 373 F.3d at 868. This is because a promise to create an offset makes the contract work as if it were fungible. *Id.* Even though the customer is unable to enter the market and purchase an equal and opposite

---

[9] While they challenge the conclusion that their transactions were not "similar to" futures contracts, the customers offer little affirmative support for their argument as to the factual similarities between their transactions and futures transactions; they do not reassert the arguments as to similarity they advanced in the bankruptcy court. They do, however, assert that the bankruptcy court erred in excluding an "expert" declaration from Martin Doyle, a trained lawyer, who attested to the various similarities between retail forex and spot metals with futures contracts. The bankruptcy court disregarded Mr. Doyle's opinions as impermissible legal conclusions. The customers maintain that it was it was improper for the court to do so because appellants did not have the opportunity to respond in a *Daubert* hearing. But courts are only required to hold *Daubert* proceedings when the record is inadequate. *Target Market Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 (7th Cir. 1998). Although experts may provide opinions as to the ultimate issues in a case, they may not offer their opinions on "legal conclusions that will determine the outcome of a case." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (affirming district court's ruling that law professor could not testify that defendant city's actions violated the Fair Housing Act); *Roundy's Inc. v. National Labor Relations Board.*, 674 F.3d 638, 648 (7th Cir. 2012); *see also United States v. Sinclair*, 74 F.3d 753, 757 n. 1 (7th Cir. 1996) (collecting cases). Mr. Doyle's declaration made clear that he was using his training and experience as an attorney to offer his opinion on the application of section 761(4)(F)(i) to retail forex and spot metal transactions. Such legal conclusions are plainly inadmissible expert opinion. *See Good Shepard*, 323 F.3d at 564. Thus, the bankruptcy court did not abuse its discretion in disregarding Mr. Doyle's testimony.

position, the dealer's promise to match the idiosyncratic terms in order to close the position without delivery provides the same ends as a fungible futures contract. *Id.* But the customers have identified no promise by Peregrine to match and thereby close its customers' positions in retail forex. The customers maintain that Peregrine's obligation to promise that it "will provide prices to be used in trading" was a categorical promise to provide offsetting contracts for any open forex position, and thus their transactions were just as fungible as a futures contract. Brief for Appellant 13, 14-CV-05024, ECF No. 8. But simply because Peregrine had the authority to set the value of a customer's position did not give the customers an unconditional right to buy an offsetting contract from Peregrine. Instead, it simply meant that Peregrine set the rules of the game, and the customers were required to play by those rules.

The appellants' statutory interpretation arguments add nothing to their argument. They first maintain that the plain language of section 761(4) supports their position, but the plain language of the statute says nothing about what makes a forex transaction sufficiently "similar to" a futures contract to bring it within the ambit of the statute. The appellants make plain that they have no "plain language" argument, moreover, by shoehorning into their analysis of the statute's plain meaning a discussion of legislative history. They maintain that Congress intended "to extend priority to the broadest possible spectrum of consumers," *id.,* but that tells us nothing; the question is who that "broadest possible spectrum" includes. Courts have been reluctant to read Chapter 7 to "protect[ ] customers that Congress has evinced no desire to protect," *In re Co Petro Marketing Group*, *Inc.* 680 F.2d 566, 572 (9th Cir. 1982), particularly when doing so would not contribute to commodity market stability.

Here, nothing in section 761, or in its legislative history, indicates that Congress intended to protect retail forex and OTC spot metals traders, as it has never extended the definition of

"commodity contract" to include agreements to sell retail forex and OTC metals. As appellants note, Congress added the "similar to" clause in 2005 in order to expand consumer protection. But, as the CFTC points out, since then, Congress has had opportunities to include OTC metal and retail forex transactions in the definition of "commodity contract" but has declined to do so. For example, in 2010, as part of Dodd-Frank, Congress amended section 761(4) to include "cleared swap" transactions, 11 U.S.C. § 761(4)(F)(ii), yet declined to include retail forex or OTC metals. Congress was obviously aware of the need to regulate retail forex in some way, as it gave the CFTC jurisdiction over forex transactions. *See* 7 U.S.C. § 2(c)(2)(D)(iii). But, still, it declined to include forex in the definition of "commodity contract" and instead limited section 761 to an array of cleared transactions. Thus, it is reasonable to infer that Congress implicitly excluded all uncleared transactions from section 761. *Barnhart v. Peabody Coal Co*., 537 U.S. 149, 168 (2003) (noting that the canon *expressio unius est exclusio alterius* carries the most force "when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence").[10]

And why would Congress offer the heightened insolvency protection provided by section 761 only for commodity transactions? Because the purpose of the Chapter 7 protections for commodity contracts is to promote market stability in the event of broker insolvency. *Id.* Congress noted that with respect to futures contracts, "[p]rotection of market stability during a

---

[10] The appellants' complaint that the "CFTC deserves no deference in its failure to follow administrative procedure in rulemaking," Brief, ECF 8, at 14, is baseless; the bankruptcy court did not ***defer*** to the CFTC's lack of rulemaking, specifically noting that "the CFTC's views are not controlling regarding the interpretation of the definition of 'commodity contract' in § 761(4)," but concluding that the regulations adopted by the CFTC—which excluded forex and metals contracts from regulations defining "customer property" subject to special priority in bankruptcy—to provide a "compelling explanation of the overall statutory and regulatory scheme that supports the conclusion that retail forex does not fall within the definition of 'commodity contract.'" 510 B.R. 190, 202.

commodity broker insolvency is more difficult in the commodities markets than in other markets." S. Rep. No. 95-989, at 5794 (1978). Volatility is exacerbated because gains and losses on open positions are paid out on a daily basis and the risk of these transactions is taken on by a clearing house; delay by the trustee in closing those positions could therefore have a ripple effect that disrupts other market actors who are also relying on that same clearing house to close those transactions. No similar systemic concern is present with retail forex and OTC metals—or any other uncleared transaction—because the customers themselves assume the risk of the exchange. And indeed, here, the risk disclosure appellants signed made them aware that in the event of a Peregrine bankruptcy, they would be treated as unsecured creditors. Appellants' Ex. 1: Risk Disclosure Statement, ¶ 3, 14-CV-05024, ECF No. 9.

Accordingly, neither the language of section 761(4) nor the intent of Congress supports a conclusion that retail forex and spot metal contracts are sufficiently similar to futures contracts to bring the customers' claims within the purview of section 761(4)'s "similar to" clause.

### C. Dismissal of Class Action Complaint as Untimely

Consolidated with this appeal is the customers' appeal of the bankruptcy court's dismissal of their class action complaint as time-barred. *See Robert Miller, Fargo 500 LLC and Gainesville Coins, Inc.,* 15-CV-04260. After the initial adversary proceeding asserting their individual claims against the Trustee was unsuccessful, customers Robert Miller, Fargo 500 LLC, and Gainesville Coins, Inc. filed a class action complaint against Peregrine alleging breach of fiduciary duty, fraud, unjust enrichment, and conversion. The bankruptcy court dismissed that complaint as untimely because it was filed more than two years after the claims bar date. The customers argue that they were not required to file a proof of claim and, if they were, their class action complaint should be construed as an amendment to their timely filed proofs of claim.

1. Proof of Claim Required

The threshold issue the customers present is whether their class action complaint was a "claim" governed by the Bankruptcy Code. Brief for Appellants 8, 15-CV-04260, ECF No. 12. In a similar vein to their arguments already addressed above, the customers argue that because their funds were held in trust, they were not part of the bankruptcy estate at all and, thus, were not a "claim" against the estate. Bodenstein maintains that this argument is waived because the customers did not raise it in the bankruptcy court below.

The Court agrees with Bodenstein and finds that the customers waived this argument by not presenting it below. In the Seventh Circuit, in order to ensure that an adequate record is developed for appellate review, bankruptcy litigants are not permitted to raise arguments for the first time on appeal. *Matter of Krone*r, 953 F.2d 317, 319 (7th Cir. 1992) (holding that Chapter 7 litigant had waived argument by not raising it in bankruptcy court below and noting that, in the Seventh Circuit, arguments not presented to the bankruptcy "court are waived and cannot be raised for the first time on appeal"); *Schaumburg Bank & Trust Co., N.A. v. Alsterda*, No. 14 C 10095, 2015 WL 1502927, at *2 (N.D. Ill. Mar. 26, 2015) (finding that bankruptcy litigant had waived standing argument because it was not presented to bankruptcy court); *Matter of Garofalo's Finer Foods, Inc.*, 186 B.R. 414, 431 (N.D. Ill. 1995) (finding that party had waived argument not presented to the bankruptcy court below). Occasionally, if the difference between two arguments "is not one of substance, but rather of form," courts are willing to look past waiver and reach the merits of an issue. *CPC Acquisitions, Inc. v. Helms*, No. 07 C 702, 2007 WL 4365342, at *2 (N.D. Ill. Dec. 12, 2007).

But here, nothing that the customers argued in the bankruptcy court below bears any substantive resemblance to the argument that their complaint is not governed by the Bankruptcy

Code's claim requirements. Instead, in opposition to Bodenstein's motion to dismiss their class action complaint, the customers maintained that the complaint should be construed as an amendment to their earlier filed proofs of claim and, therefore, was timely. Indeed, the bankruptcy court noted that the customers "do not dispute that the claims asserted in the complaint are 'claims' for purposes of § 101(5)." *In re Peregrine Fin. Group, Inc.*, 2015 WL 2237201, at *4. Moreover, in their reply brief, the customers do not respond to Bodenstein's waiver argument, effectively abandoning their assertion that their complaint was not a "claim" within the meaning the bankruptcy code.

Even if the customers' argument had not been waived, it would still fail on its merits. As discussed above, the record makes plain that the retail forex and OTC metal customers' funds were not held in any form of trust. But even if they were held in trust, a section 101(5) claim also includes the "right to ***an equitable remedy*** for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(5)(B) (emphasis added). Thus, if the equitable remedy— such as the imposition of a trust—creates a right to repayment from the estate, that right is categorized as a "claim" under section 101(5)(B). *In re Kings Terrace Nursing Home and Health Related Facility*, 184 B.R. 200, 203 (S.D.N.Y. 1995) ("Congress intended the definition of 'claim' to include a right to an equitable remedy for a breach of performance that gives rise to a right of payment.").

Here, the customers are seeking imposition of a constructive trust so that they may receive payment from the estate apart from any other creditor,[11] and because a "right to

---

[11] In their brief, the customers neglect to mention that in addition to their requested equitable relief, their complaint contains tort claims that seek both compensatory and punitive damages from Peregrine due to Wasendorf's criminal conduct. A tort claim for money damages from the estate is plainly a "claim" within the meaning of section 101(5)(A). *In re Kewanee Boiler Corp.*, 198 B.R. 519, 528 (Bankr. N.D. Ill. 1996); *In re Jason Pharm., Inc.*, 224 B.R. 315,

repayment means nothing more nor less than an enforceable obligation" to receive payment, *Johnson*, 501 U.S. at 83 (internal quotation and citation omitted), their requested relief falls squarely within the broad purview of section 101(5)(B). *Kinney v. Gallagher*, 524 B.R. 455, 464 (W.D.N.Y. 2015) (litigant seeking right to repayment from bankruptcy estate through a constructive trust was asserting a "claim" against the estate). Accordingly, even if the argument was not waived, it fails on its merits.

  2. Relation Back

   Turning to the primary argument the customers raise on appeal, the customers maintain that under Rule 15(c) of the Federal Rules of Civil Procedure, their class action complaint should relate back to their earlier filed proofs of claim because they arise out of the same nucleus of facts or that the court should have freely allowed amendment under 15(a)(2). Brief for Appellants 9-12, 15-CV-04260, ECF No. 12. Bodenstein argues that the class action complaint should not relate back to the proofs of claim because the claims set forth in the former sound in tort while the proofs of claims lodged in the bankruptcy case sound in contract. The bankruptcy court declined to allow the customers to amend their proofs of claim by means of the class action complaint, finding that it was "a poorly disguised attempt to bring new claims against the Peregrine bankruptcy estate long after the claims bar date passed" and was, thus, time-barred. *In re Peregrine Fin. Group*, *Inc*., 2015 WL 2237201, at *1. That finding is reviewed for an abuse of discretion and "will be over-turned only in extreme cases." *Boone Cnty. Utilities, LLC,* 506 F.3d 541, 542 (7th Cir. 2007) (internal quotation and citation omitted); *Matter of Stavriotis*, 977 F.2d

---

319 (Bankr. D. Md. 1998) (tort claims against debtor constituted section 101(5) "claims"); *In re Criswell*, 44 B.R. 95, 98 (Bankr. E.D. Va. 1984) (complaint seeking punitive damages was a "claim" within the meaning of the bankruptcy code).

1202, 1204 (7th Cir. 1992). Here, it is apparent that the bankruptcy court did not abuse its discretion in finding the customers' class action complaint time-barred.

As an initial matter, although the bankruptcy court analyzed the customers' argument under Rule 15, Rule 15 does not directly apply to proofs of claim in a bankruptcy case. Rule 7015 of the Federal Rule of Bankruptcy Procedures provides that Rule 15 of the Federal Rules of Civil Procedure applies in adversary proceedings. But filing a proof of claim is not considered an "adversary proceeding." *Matter of Plunkett*, 82 F.3d 738, 740 (7th Cir. 1996) (proof of claim is considered a core rather than an adversary proceeding). Rule 9014 of the Federal Rules of Bankruptcy Procedure provides that certain specified provisions in the 7000 series of rules also apply to contested proceedings, but Rule 7015 is not included in that list. Nevertheless, as the bankruptcy court noted, the Seventh Circuit has on occasion applied Rule 15 to amendments of proofs of claims filed after the bar date. *In Re Plunkett*, 82 F.3d at 741 (analyzing amendment to proof of claim under Rule 15); *In re Stavriotis*, 977 F.2d 1202, 1204 (7th Cir. 1992) (electing to apply Rule 15 through Rule 7015 to proof of claim proceeding even though it was not a contested proceeding); *Matter of Unroe*, 937 F.2d 346, 349 (7th Cir. 1991) (applying Rule 15(c) standard in determining later filed claim did not relate back to earlier claim). And given that both parties agree, to a certain extent, that Rule 15 applies to the customers' complaint, the Court will apply it here.

The relevant question, though, is not so much whether the customers are permitted to amend their proofs of claim, but whether the amendment relates back to the timely original claims; if not, the amendment is pointless. Under Rule 15(c), an amendment relates back to the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R.

Civ. P. 15(c)(1)(B). Bodenstein maintains that the customers' class action complaint should not be deemed to relate back to their earlier proofs of claim because the former sounds in tort while the latter sounded in contract. But courts have routinely allowed relation back when litigants shift from a contract theory to a tort theory. *See C. Corkin & Sons, Inc. v. Tide Water Associated Oil Co.*, 20 F.R.D. 402, 404 (D. Mass. 1957); *Brennan v. Tar Heel Home Supply, Inc.*, 62 F.R.D. 190, 194 (E.D.N.C. 1974); *Nola Elec. Co. v. Reilly*, 93 F. Supp. 164, 173 (S.D.N.Y. 1948). That is because it is not the technical label of the claim that bears on the relation back inquiry, but rather the underlying facts alleged in the complaint. *Henderson v. Bolanda*, 253 F.3d 928, 931 (7th Cir. 2001). If the facts in the amended complaint remain essentially the same and have "been brought to [the] defendant's attention by" the original complaint—so that the opposing party is given adequate notice of the existence, nature, and amount of the new claim—then the amended complaint will relate back to the timely filed claim. *See Novell,* 431 B.R. at 442-43. In other words, if the "amended claim asserts a new claim on the basis of the same core of facts" alleged in the original claim then a sufficient factual link exists to warrant relation back. *In re marchFirst, Inc.,* 448 B.R. 499, 507 (Bankr. N.D. Ill. 2011).

But, conversely, where the amended complaint asserts a new, distinct cause of action that arises out of the same general event but is premised on a distinct factual basis, then the amended complaint will not relate back to the previous complaint. *Barnes v. Callaghan & Co.*, 559 F.2d 1102, 1105 (7th Cir. 1977). In *Barnes,* for example, the plaintiff's original complaint alleged a breach of contract claim that resulted in her termination. *Id.* The plaintiff attempted to assert a cause of action for slander in her amended complaint that allegedly occurred because of that termination. *Id.* But because the original complaint failed to allege any facts indicating malice or publication, the Seventh Circuit held that the slander count was a new, distinct cause of action

that did not arise out of the same series of events that was the basis for her breach of contract claim, and relation back was not warranted. *Id.* at 1106.

Similarly here, the customers fail to point to any facts in their original proofs of claim that could be construed as asserting a claim for a breach of fiduciary duty, fraud, unjust enrichment, or conversion. In their individual proofs of claim, each customer asserted a right to payment based solely on the customer's contractual relationship with PFG. None of the customers asserted—or identified any facts indicating—that Wasendorf's fraud was the basis of their right to repayment. Instead, each customer filed a timely proof of claim on a form entitled "Forex Customer Claim Form" that stated their remaining forex account balance that they believed they were due. The customers did not allege any other facts. The form also asked the customers if they asserted "any claims against PFG based on your forex account at PFG that are not reflected in your account balance." Appellants' Ex. 1: Forex Customer Claim Form, 14-CV-05024, ECF No. 9. The form goes onto request that, if they do have additional claims against PFG, to provide a basis for those claims in an attached document. *Id.* Each customer indicated that the customer had no additional claims against Peregrine and, accordingly, provided no factual basis to support any additional claims. *See id.* Since they provided no facts—other than the amount of money they held in their Peregrine accounts—to support their proofs of claim, it cannot be said that Bodenstein was put on notice of the factual basis for the customers' tort claims, making relation back improper.

*Disch v. Rasmussen*, which the customers cite, does not support a different conclusion. 417 F.3d 769, 773 (7th Cir. 2005). To begin, *Disch* did not involve a proof of claim at all. Instead, creditor Disch filed a claim under section 523 seeking to exclude from discharge the debt Rasmussen owed to him. Disch's initial complaint indicated that Disch's debt should be

excluded from discharge based on Rasmussen's "dishonesty in obtaining the loans, her defalcation or embezzlement, and her willful and malicious injury to him through embezzlement and conversion." *Id*. at 775. The claimant later amended that complaint to include a section 727(a) claim which, like the section 523 claim, focused on the use and whereabouts of the money Disch lent to Rasmussen. *Id.* Thus, even though the legal theory of the case had changed, relation back was warranted because the factual allegations remained the same. *Id.*

Here, by contrast, in their proofs of claim, the customers initially alleged a right to repayment based only on the contractual relationship they entered with Peregrine, and the only facts they offered supporting that claim was the value of their accounts. Unlike in *Disch,* the customers' subsequent class action complaint involves completely new legal theories *and* completely new facts. Accordingly, because the factual allegations in their class action complaint did not arise "out of the conduct, transaction, or occurrence" set forth in their original proofs of claim, relation back under 15(c) is not warranted.

The customers also argue that the bankruptcy court erred in not allowing the customers to amend their claim under Rule 15(a)(2), which states that a party "may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). But in the case of late filed proofs of claim, "justice does not *require* amendment, and indeed rarely *permits* amendment, once the last date for filing claims has passed." *Matter of Plunkett*, 82 F.3d 738, 741 (7th Cir. 1996) (emphasis in original). This is because "[l]ate-filed claims, especially in the bankruptcy context, disrupt orderly discharge and should generally be barred." *Matter of Unroe*, 937 F.2d 346, 351 (7th Cir. 1991).

The customers maintain that the Seventh Circuit's opinion in *In re Mississippi Valley Livestock, Inc.,* 745 F.3d 299 (7th Cir. 2014), which was issued after they filed their proofs of claim, represented a change in law that somehow excused the untimely filing of their complaint and should have compelled the bankruptcy court to allow amendment under Rule 15(a)(2). In *Mississippi Valley*, the Seventh Circuit held that a constructive trust remedy could be imposed in a bankruptcy case under certain circumstances. *See id.* at 304-07. The customers cite a number of cases where courts allowed amendments to complaints—in the non-bankruptcy context—after a change in law occurred. But those cases involved a change in law that created a new cause of action or defense, rather than simply a new remedy. *See Smart v. Arnone*, 315 F. Supp. 2d 292, 294 (W.D.N.Y. 2004) (untimely amendment to answer allowed because of newly available affirmative defense); *Lakeside v. Freightliner Corp*., 612 F. Supp. 10, 13 (D. Or. 1984) (untimely amendment to complaint allowed after new cause of action created); *Teamsters Pension Trust Fund of Philadelphia and Vicinity v. CBS Records, a Div. of CBS, Inc*., 103 F.R.D. 83, 85 (E.D. Pa. 1984) (untimely amendment to answer permitted because of newly available statute of limitations defense). As the bankruptcy court noted, *Mississippi Valley* did not make a new claim available to the customers; rather, it simply recognized the possibility that the imposition of constructive trust **remedy** was appropriate in certain bankruptcy cases. *See Scholes v. Ames*, 850 F. Supp. 707, 712 (N.D. Ill. 1994) (noting that a constructive trust is an equitable remedy and not an independent cause of action). Thus, the customers were not precluded from bringing their tort **claims** prior to *Mississippi Valley*, as claims for breach of fiduciary duty, fraud, unjust enrichment, and conversion were already available. Moreover, it is clear that *Mississippi Valley* was not a revelation to the customers or their counsel as to the potential availability of a constructive trust remedy. As Judge Doyle noted, the class action plaintiffs were represented by

the same attorneys who represented the Secure Leverage plaintiffs and had sought the imposition

of a constructive trust in the original *Secure Leverage* adversary proceeding some two years

before the *Mississippi Valley* opinion was issued.

Accordingly, the bankruptcy court did not abuse its discretion in declining to allow the

customers to amend their proofs of claim under Rule 15.[12] The customers alleged virtually no

facts in their initial proofs of claim against Peregrine, other than the amount of money owed,

which precludes their subsequent tort claims against Wasendorf from relating back to the timely

proofs of claim.

### E. Bodenstein's Motion for Sanctions

The final issue before the Court is Bodenstein's motion for sanctions against the

customers' counsel for filing a motion to withdraw the reference of the class action adversary

proceeding from the bankruptcy court to this Court.[13] In that motion, the customers argued that

the adversary proceeding should be withdrawn because (1) the customers have a right to a jury

trial and the bankruptcy court therefore cannot adjudicate them, and (2) their claims against

Bodenstein are non-core under 28 U.S.C. § 157(b). Bodenstein maintains that each of those

arguments is sanctionable under Federal Rule of Civil Procured Rule 11(c) and 28 U.S.C.

§ 1927. The Court disagrees.

The court may impose sanctions under Rule 11 "if a lawsuit is 'not well grounded in fact

and is not warranted by existing law or a good faith argument for the extension, modification, or

reversal of existing law.'" *Cuna Mut. Ins. Soc'y v. Office & Prof'l Emps. Int'l Union, Local 39*,

---

[12] The customers dedicate a substantial portion of their brief to arguing that a constructive trust remedy is the appropriate remedy in this case. But because the bankruptcy court was correct in finding that amendment was inappropriate and the customers' complaint was time barred, it is unnecessary to address the appropriate remedy.

[13] That motion was mooted by bankruptcy court's dismissal of the customer's class action complaint.

443 F.3d 556, 560 (7th Cir. 2006) (quoting *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 963 (7th Cir. 1993)). This is an objective analysis that determines whether the party or counsel should have known that a position advanced to the court is unsupported. *Id.* To impose sanctions, the court must find that the claims are frivolous or calculated to harass or abuse. *Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago*, 649 F.3d 539, 553 (7th Cir. 2011). This determination is "within the sound judgment of the district court." *Cooney v. Casady*, 735 F.3d 514, 523 (7th Cir. 2013). Section 1927, on the other hand, "sets a higher standard for sanctions than do other sources such as Fed. R. Civ. P. 11(c)(3), 26(g)(3), and 37(a)(5), (b)." *United Stars Indus., Inc.*, 525 F.3d at 610. The court may impose sanctions under section 1927 when an "attorney 'has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice . . . or where a claim [is] without a plausible legal or factual basis and lacking in justification.'" *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 708 (7th Cir. 2014) (quoting *Walter v. Fiorenzo*, 840 F.2d 427, 433 (7th Cir. 1988)).

Bodenstein fails to satisfy either the Rule 11 or the section 1927 inquiry. With respect to the jury argument, he maintains that this Court should impose sanctions against the customers because a reasonably careful lawyer should have known that the customers waived their right to a trial by jury by filing proofs of claim. Def.'s Mot. Sanctions ¶ 28, ECF No. 13. It is generally true, as Bodenstein points out, that when a creditor files a proof of claim, they waive their right to a jury trial on that claim. *See, e.g., Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990). But that waiver does not extend to claims falling outside the claims allowance process. *See Germain v. Connecticut National Bank*, 988 F.2d 1323, 1327 (2d. Cir. 1993). As the customers represented in appealing the bankruptcy court's dismissal of their class action complaint, their chief

argument was that their claims against the estate were not "claims" governed by bankruptcy code. Although, here, that argument was unsuccessful, as discussed above, it was hardly without "a plausible legal or factual basis and lacking in justification." *Smith*, 761 F.3d at 708.

With respect to the non-core argument, Bodenstein argues that even though the customers' "causes of action may appear to be traditional non-core claims, they are actually core because they demand money from the Estate." ECF No. 13, ¶ 34. But simply because a plaintiff demands money from the estate does not mean the proceeding is a core proceeding and is within the jurisdiction of the bankruptcy court. Instead, "[c]ore proceedings are actions by or against the debtor that arise under the Bankruptcy Code in the strong sense that the Code itself is the source of the claimant's right or remedy, rather than just the procedural vehicle for the assertion of a right conferred by some other body of law, normally state law." *Matter of U.S. Brass Corp.*, 110 F.3d 1261, 1268 (7th Cir. 1997); *In re Repository Techs., Inc.*, 601 F.3d 710, 719 (7th Cir. 2010) ("A proceeding 'arises in' bankruptcy only if it has 'no existence outside of the bankruptcy'"); *Barnett v. Stern*, 909 F.2d 973, 981 (7th Cir. 1990) (holding civil RICO claim stemming from diversion of trust funds non-core because "the claim does not invoke a substantive right created by federal bankruptcy law . . . [and] this is a claim that could exist outside of the bankruptcy context"). Here, state law, and not the bankruptcy code, is the substantive source of the customers' tort claims and requested constructive trust. Because they are claims that could exist outside the bankruptcy context, it was not unreasonable for the customers to argue that they are "non-core" within the meaning of section 157.[14] Hence, notwithstanding their merits, none of the customers' arguments with respect to their motion are sanctionable.

---

[14] Bankruptcy courts also have original jurisdiction over proceedings that are "related" to a case under the code. *In re Markos Gurnee Partn.*, 182 B.R. 211, 214 (Bankr. N.D. Ill. 1995). It is possible that the customers claims could have "[s]uch a potential effect on the estate . . . to

*    *    *

For the foregoing reasons, the judgments of the bankruptcy court at issue in 14 C 5024

and 15 C 4260 are affirmed. Bodenstein's motion for sanctions in 15 C 344 is denied.


Date: August 15, 2016

                                                                   _____

                                                                   John J. Tharp, Jr.
                                                                   United States District Judge

---

place [the customers'] claim within this circuit's definition of 'related to' jurisdiction." *Barnett*, 909 F.2d at 981. But, without deciding that issue definitively, it is enough to say here that the issue is close enough to make the imposition of sanctions inappropriate.